# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLORADO

Civil Action No. 18-cv-02093-NYW

DEBRA REEVES,

    Plaintiff,

v.

COMMISSIONER, SOCIAL SECURITY ADMINISTRATION,

    Defendant.

## MEMORANDUM OPINION AND ORDER

Magistrate Judge Nina Y. Wang

    This civil action arises under Titles II and XVI of the Social Security Act ("Act"), 42 U.S.C. §§ 401-33 and 1381-83(c) for review of the Commissioner of Social Security Administration's ("Commissioner" or "Defendant") final decision denying Plaintiff Debra Reeves's ("Plaintiff" or "Ms. Reeves") applications for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI"). Pursuant to the Parties' consent [#15], this civil action was referred to this Magistrate Judge for a decision on the merits. *See* [#20]; 28 U.S.C. § 636(c); Fed. R. Civ. P. 73; D.C.COLO.LCivR 72.2. Upon review of the Parties' briefing, the entire case file, the Administrative Record, and the applicable case law, this court respectfully **AFFIRMS** the Commissioner's decision.

## BACKGROUND

**I.    Medical History**

    Ms. Reeves, born December 15, 1956, alleges she became disabled on December 31, 2013, at 57 years-of-age, due to paralysis on her "right side" and complications from two strokes. *See*

[#13-3 at 72,[1] 85, 102, 113; #13-5 at 216, 220; #13-6 at 238, 245, 266, 290]. In 2009, Plaintiff suffered her first of two strokes, with the second being in 2011; Plaintiff attributes her dizziness and/or vertigo to her second stroke.[2] *See* [#13-7 at 319, 322, 341, 348; #13-9 at 431].

In 2012 and 2014 Ms. Reeves's sought treatment for her various physical ailments from Rodney Harrison, M.D. Progress notes dated October 26, 2012 indicate that Plaintiff "is regularly dizzy when she attempts to do anything." [#13-7 at 319, 322]. Ms. Reeves did not receive treatment for her dizziness at the time, and denied any blurred vision, vertigo, muscle weakness, numbness, and lightheadedness, among other symptoms. [*Id.* at 319-21, 323-24]. Dr. Harrison's progress notes from 2014 similarly assess dizziness and note that Ms. Reeves complains of dizziness upon even minimal exertion, though Ms. Reeves received no treatment for this ailment. *See, e.g.*, [*id.* at 350, 353-54].

Thomas J. Motycka, M.D. performed a comprehensive neurological examination on June 30, 2015. *See* [#13-7 at 357]. Dr. Motycka noted that Ms. Reeves "claims she could only walk 10 feet and then she gets dizzy and would have to lean against something to walk, but this was not in evidence as she exited the facility today." *See* [*id.* at 358]. Upon physical examination, Dr. Motycka noted that Ms. Reeves was "well-developed, well-nourished . . . in no apparent distress"; that Ms. Reeves "move[d] easily through all positions needed for examination, symmetrically, and without distress or pain-facies developing"; that Ms. Reeve showed no signs of "disorganization of any motor function of the extremities"; that Ms. Reeves passed the mini-mental status exam

---

[1] When citing to the Administrative Record, the court utilizes the docket number assigned by the CM/ECF system and the page number associated with the Administrative Record, found in the bottom right-hand corner of the page. For all other documents the court cites to the document and page number generated by the CM/ECF system.

[2] Ms. Reeves's appeal focuses solely on her dizziness and/or vertigo, and thus I discuss the medical evidence concerning only this ailment.

2

with "flying colors"; and that Ms. Reeves's "personal appearance, thought content, organization, mood/affect, behavior, judgment, and capability to manage funds [were] all intact." [*Id.* at 359-61]. Dr. Motycka assessed that Plaintiff had "normal function." [*Id.* at 361].

In 2016, Plaintiff presented to Aurora Denver Cardiology. Progress notes list lightheadedness as one of Plaintiff's many ailments, and reveal that Plaintiff reported her dizziness was worse with rising but better with spread out medication doses and that her vertigo is likely related to her stroke. *See* [#13-7 at 373, 376-78, 380]. August 15, 2016 progress notes report lightheadedness as one of Plaintiff's chief complaints and indicate a plan for physical therapy as treatment for her vertigo. *See* [*id.* at 367, 370]. Physical examinations revealed that Ms. Reeves was alert and oriented, and none mentioned any objective findings associated with her dizziness.

Medical records from Green Valley Ranch Medical Clinic reveal that Ms. Reeves complained of becoming "very dizzy both with standing, walking, or even at time when just sitting." *See* [#13-8 at 387-88, 390, 393-94, 396, 399, 403]. On one occasion, progress notes indicated that Ms. Reeves's dizziness responded positively to stopping trimamterne. *See* [*id.* at 394]. On May 5, 2016, Plaintiff complained of "chronic dizziness that started this [morning] when she woke up," which was worse upon standing but alleviated by sitting and time and which caused nausea. *See* [*id.* at 401]. Plaintiff's medical provider ruled out cerebellar stroke and heart palpitations, but informed Plaintiff that "many conditions can cause dizziness" and directed her to increase her fluids, avoid caffeine, and monitor how quickly she went from sitting to standing. *See* [*id.*].

Ms. Reeves began physical therapy for her dizziness on November 30, 2016. *See* [#13-9 at 431]. The Initial Examination revealed that Ms. Reeves complained of dizziness following her second stroke in 2011, that changing positions from sitting to standing, quick transfers out of bed,

3

and quick movements of her head upwards exacerbated her dizziness, and that she fell walking up the stairs because of her dizziness; the Initial Examination also revealed a positive Romberg Test. *See* [*id.* at 431, 433]. On December 7, 2016, Ms. Reeves reported that her dizziness remained unchanged. *See* [*id.* at 436]. On December 10, 2016, Ms. Reeves again stated that she "feels about the same," but treatment notes report Plaintiff was doing "well with exercises, has minimal increase in [symptoms]," that rest and corrected technique relieved her symptoms, and that Ms. Reeves tolerated added exercises with "mild dizziness symptoms." [*Id.* at 438]. Treatment notes dated December 14 and16, 2016 reveal that Ms. Reeves reported no change in her dizziness, and that Plaintiff experienced increased dizziness with exercises, requiring frequent breaks. [*Id.* at 440, 442]. Treatment notes from December 21, 2016, however, indicated that Ms. Reeves did not need to take as many breaks during exercises as needed previously. *See* [*id.* at 444]. Two days later, Ms. Reeves reported that she felt "good today and doesn't feel as dizzy'; however, she was "unable to finish her exercises" because of high blood pressure and not feeling well. *See* [*id.* at 446]. On December 28, 2016, Ms. Reeves presented to physical therapy "feeling a little dizzy," but she completed "all exercises without many rest breaks." [*Id.* at 448].

Ms. Reeves continued physical therapy into 2017. Treatment notes from January 3, 2017 note that she reported feeling good and not dizzy on the bus ride over when keeping her head up, but Ms. Reeves's physical examination results remained largely unchanged since November 30, 2016, including a positive Romberg test, and her dizziness symptoms continued with "minimal change since starting therapy." [#13-9 at 450-55, 457, 459]. The next day, Ms. Reeves reported that "she feels pretty good . . . [and] not feeling as dizzy as usual"; however, she required "more rest break [sic] during exercises due to feeling dizzy and hot." [*Id.* at 461]. On January 6, 2017, Ms. Reeves stated her dizziness was "constant in nature" but that her balance had "improved at

4

home"; the treatment notes also indicated that Ms. Reeves tolerated a progression of exercises. *See* [*id.* at 463]. Treatment notes dated January 11, 2017 reveal that Ms. Reeves reported overall improvement with her balance and strength and that she could do more at home without feeling as dizzy despite unchanged physical examination results; and though her progress was slow, the treatment notes indicate that Ms. Reeves had "less difficulty with walking due to improved balance" and that she was halfway to completing several of her short-term and long-term treatment goals. *See* [*id.* at 465-67, 469].

Following an approximately 30-day absence from physical therapy, Plaintiff returned for treatment on February 24, 2017; the treatment notes report that Plaintiff continued to feel dizzy and off-balance and that Plaintiff had not made any progress since her last visit. *See* [#13-9 at 471-74]. March 1, 2017 treatment notes indicate that Plaintiff reported continued dizzy spells throughout her day and difficulty with the Romberg test despite no adverse reactions to the exercises. *See* [*id.* at 476]. Two days later, Ms. Reeves stated that her dizziness persisted but was decreased from her last session, and her treatment notes reveal that she improved with the Romberg test (though requiring close monitoring) and finished the session with no adverse effects. *See* [*id.* at 478]. Treatment notes dated March 8 and 17, 2017, respectively, indicate that Ms. Reeves reported gaining strength and overall improvement despite lingering dizziness spells, and that Ms. Reeves completed the sessions with no adverse effects. *See* [*id.* at 480-84]. On March 24, 2017, Ms. Reeves reported feeling "a little dizzy" but attributed that to therapy being at an earlier time than usual, as well as that she feels like she "had improvement in her symptoms since starting therapy"; the treatment notes also revealed that Ms. Reeves was "making progress with improved balance and reduction in dizziness symptoms." [*Id.* at 486].

Ms. Reeves returned to physical therapy on April 5, 2017, and reported "feeling off today" despite "feeling decent on average since [her] last session"; her physical examination results remained unchanged and she had mild instability throughout the session. *See* [*id.* at 488-90, 492]. Plaintiff's last physical therapy session occurred on April 10, 2017; Ms. Reeves stated that "she is still dizzy and having balance issues," and her treatment notes indicate that she had increased loss of balance and dizziness with "Romberg EC head shakes and nods," that she "demonstrates improving balance . . . but is still far from safe in her balance, gait and functional mobility," and that she "may never obtain full safety with scenarios which challenge her balance, particularly uneven ground and/or dark hallways/rooms." [*Id.* at 494]. Ms. Reeves was discharged from physical therapy on May 10, 2017, having only reached 50% completion of most of her short-term and long-term goals. *See* [*id.* at 494-95].

## II. Procedural History

On January 7, 2015, Plaintiff protectively filed applications for DIB and SSI. [#13-3 at 72, 85, 98, 101]. The Social Security Administration denied Plaintiff's application administratively on July 9, 2015, *see* [*id.* at 98-101], and again on reconsideration, *see* [*id.* at 124-27; #13-4 at 137-44]. Ms. Reeves requested a hearing before an Administrative Law Judge ("ALJ"), *see* [#13-4 at 136], which ALJ Terrence Hugar ("the ALJ") held on May 31, 2017, *see* [#13-2 at 14, 32]. The ALJ received testimony from the Plaintiff and Vocational Expert William Tisdale (the "VE") at the hearing. *See* [*id.* at 32].

Plaintiff testified that she can no longer work because she is "dizzy all day long" and cannot walk that well—symptoms she has dealt with since her second stroke in 2011. *See* [#13-2 at 36, 38, 42]. Ms. Reeves explained that her symptoms cause her to fall; that looking upwards exacerbates her dizziness; that she has to "lean up against the wall" when walking down stairs;

6

and that some of her medications also cause dizziness. *See* [*id.* at 39, 42-43]. Plaintiff continued that her doctors informed her that these conditions "won't get any better." *See* [*id.* at 36-37]. Ms. Reeves testified that she would work if she could and that she lives in the basement of her friend's house, where she stays almost all day, except to go to doctors' appointments, because of her ailments. *See* [*id.* at 39-42]. Ms. Reeves concluded her testimony by stating that she stopped working in 2010 when her employer went out of business; she had worked as a cashier and manager at a gas station and then again as a cashier. *See* [*id.* at 42, 45].

The VE then testified at the hearing. The VE first summarized Plaintiff's past relevant work to include a cashier, specific vocational preparation ("SVP")[3] level 2, light exertion job; a retail manager, SVP level 7, light exertion job; and a driver, SVP level 3, medium exertion job. *See* [#13-2 at 47]. The VE then considered the work an individual could perform when limited to medium exertional jobs, with non-exertional limitations of no exposure to unprotected heights and moving mechanical parts, no concentrated exposure to extreme heat, cold, and humidity, and no far acuity. *See* [*id.*]. The VE testified that this individual could perform Ms. Reeves's past relevant work as cashier and retail manager, *see* [*id.*], and that such an individual could perform these two jobs if limited to only light exertional work, *see* [*id.* at 48]. The VE continued that such an individual could also perform Ms. Reeves's past relevant work as a cashier if limited to light or medium exertional work and simple, routine, or repetitive tasks. *See* [*id.* at 48-49]. The VE

---

[3] SVP refers to the "time required by a typical worker to learn the techniques, acquire the information, and develop the facility needed for average performance in a specific job-worker situation.'" *Vigil v. Colvin*, 805 F.3d 1199, 1201 n.2 (10th Cir. 2015) (citing Dictionary of Occupational Titles, App. C, Sec. II (4th ed., revised 1991)); 1991 WL 688702 (G.P.O.). The higher the SVP level, the longer time is needed to acquire the skills necessary to perform the job. Jeffrey S. Wolfe and Lisa B. Proszek, SOCIAL SECURITY DISABILITY AND THE LEGAL PROFESSION 163 (Fig. 10-8) (2003).

continued that employees "could not be off task more than about 10 to 15 percent of the workday or work week in order to sustain employment." [*Id.* at 49].

Upon follow-up from Plaintiff's counsel, the VE testified that an individual who required an afternoon nap of about an hour or more would be incompatible with competitive employment. *See* [#13-2 at 50-51]. The VE stated that the same would be true of an individual that regularly fell on the job and required additional medical assistance or needed to cease working for the day. [*Id.* at 51]. Further, the VE testified that an individual who could only occasionally finger and reach could not perform Ms. Reeves's past relevant work as a cashier. *See* [*id.*]. The VE concluded that his testimony was consistent with the Dictionary of Occupational Titles ("DOT") and that his experience supplemented his application of the DOT. *See* [*id.* at 49].

On August 18, 2017, the ALJ issued a decision finding Ms. Reeves not disabled under the Act. [#13-2 at 26]. Plaintiff requested Appeals Council review of the ALJ's decision, which the Appeals Council denied, rendering the ALJ's decision the final decision of the Commissioner. *See* [*id.* at 2-4]. Plaintiff sought judicial review of the Commissioner's final decision in the United States District Court for the District of Colorado on August 17, 2018, invoking this court's jurisdiction to review the Commissioner's final decision under 42 U.S.C. § 1383(c)(3).

## STANDARD OF REVIEW

In reviewing the Commissioner's final decision, the court is limited to determining whether the decision adheres to applicable legal standards and is supported by substantial evidence in the record as a whole. *Berna v. Chater*, 101 F.3d 631, 632 (10th Cir. 1996) (citation omitted); *cf. Thompson v. Sullivan,* 987 F.2d 1482, 1487 (10th Cir. 1993) ("[I]f the ALJ failed to apply the correct legal test, there is a ground for reversal apart from a lack of substantial evidence." (internal citation omitted)). The court may not reverse an ALJ simply because she may have reached a

different result based on the record; the question instead is whether there is substantial evidence showing that the ALJ was justified in her decision. *See Ellison v. Sullivan,* 929 F.2d 534, 536 (10th Cir. 1990). "Substantial evidence is more than a mere scintilla and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Flaherty v. Astrue,* 515 F.3d 1067, 1070 (10th Cir. 2007) (internal citation omitted). But "[e]vidence is not substantial if it is overwhelmed by other evidence in the record or constitutes mere conclusion." *Musgrave v. Sullivan,* 966 F.2d 1371, 1374 (10th Cir. 1992) (internal citation omitted). The court may not "reweigh the evidence or retry the case," but must "meticulously examine the record as a whole, including anything that may undercut or detract from the ALJ's findings in order to determine if the substantiality test has been met." *Flaherty,* 515 F.3d at 1070 (internal citation omitted).

## ANALYSIS

**I.     The ALJ's Decision**

An individual is eligible for DIB benefits under the Act if she is insured, has not attained retirement age, has filed an application for DIB, and is under a disability as defined in the Act. 42 U.S.C. § 423(a)(1). SSI is available to an individual who is financially eligible, files an application for SSI, and is disabled as defined in the Act. 42 U.S.C. § 1382. An individual is determined to be under a disability only if her "physical or mental impairment or impairments are of such severity that [s]he is not only unable to do [her] previous work but cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy. . . ." 42 U.S.C. § 423(d)(2)(A). The disabling impairment must last, or be expected to last, for at least 12 consecutive months. *See Barnhart v. Walton*, 535 U.S. 212, 214-15 (2002). Additionally, the claimant must prove she was disabled prior to her date last insured. *Flaherty*, 515 F.3d at 1069.

9

The Commissioner has developed a five-step evaluation process for determining whether a claimant is disabled under the Act. 20 C.F.R. § 404.1520(a)(4)(v). *See also Williams v. Bowen*, 844 F.2d 748, 750–52 (10th Cir. 1988) (describing the five steps in detail). "If a determination can be made at any of the steps that a claimant is or is not disabled, evaluation under a subsequent step is not necessary." *Williams*, 844 F.2d at 750. Step one determines whether the claimant is engaged in substantial gainful activity; if so, disability benefits are denied. *Id.* Step two considers "whether the claimant has a medically severe impairment or combination of impairments," as governed by the Secretary's severity regulations. *Id.*; *see also* 20 C.F.R. § 404.1520(e). If the claimant is unable to show that his impairments would have more than a minimal effect on his ability to do basic work activities, he is not eligible for disability benefits. If, however, the claimant presents medical evidence and makes the *de minimis* showing of medical severity, the decision maker proceeds to step three. *Williams*, 844 F.2d at 750. Step three "determines whether the impairment is equivalent to one of a number of listed impairments that the Secretary acknowledges are so severe as to preclude substantial gainful activity," pursuant to 20 C.F.R. § 404.1520(d). *Id.* At step four of the evaluation process, the ALJ must determine a claimant's Residual Functional Capacity ("RFC"), which defines the maximum amount of work the claimant is still "functionally capable of doing on a regular and continuing basis, despite his impairments: the claimant's maximum sustained work capability." *Williams*, 844 F.2d at 751; *see also id.* at 751–52 (explaining the decisionmaker must consider both the claimant's exertional and nonexertional limitations). The ALJ compares the RFC to the claimant's past relevant work to determine whether the claimant can resume such work. *See Barnes v. Colvin*, 614 F. App'x 940, 943 (10th Cir. 2015) (citation omitted). "The claimant bears the burden of proof through step four of the analysis." *Neilson v. Sullivan*, 992 F.2d 1118, 1120 (10th Cir. 1993).

At step five the burden shifts to the Commissioner to show that a claimant can perform work that exists in the national economy, taking into account the claimant's RFC, age, education, and work experience. *Neilson*, 992 F.2d at 1120. The Commissioner can meet her burden by the testimony of a vocational expert. *Tackett v. Apfel*, 180 F.3d 1094, 1098–99, 1101 (9th Cir. 1999).

The ALJ found that Ms. Reeves met the insured status requirements for DIB through September 30, 2015, and had not engaged in substantial gainful activity since December 31, 2013. [#13-2 at 16]. At step two the ALJ determined Ms. Reeves had the following severe impairments: status-post two cerebrovascular accidents, hypertension, low vision, and obesity. [*Id.*]. At step three the ALJ determined that Plaintiff did not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in Title 20, Chapter III, Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925, 416.926). [*Id.* at 18]. At step four the ALJ determined Plaintiff had the RFC to perform light exertional work subject to several non-exertional limitations, and concluded that Ms. Reeves could perform her prior relevant work as a cashier and a retail manager. *See* [*id.* at 19, 25]. The ALJ thus found Ms. Reeves not disabled at step four. *See* [*id.* at 26].

On appeal, Plaintiff argues that the ALJ erred at: (1) step two for not finding Plaintiff's dizziness to be a severe impairment; (2) at step three for not finding that Plaintiff's dizziness met or medically equaled the appropriate listing; and (3) at the RFC determination for not finding additional functional limitations caused by Plaintiff's dizziness. *See generally* [#17; #19]. I consider each in turn.

## II. Step Two

At step two the Commissioner determines whether a claimant has any severe physical or mental impairments. *See Williams*, 844 F.2d at 750. "To find a 'severe' impairment at step two

11

requires only a threshold showing that the claimant's impairment has 'more than a minimal effect on [her] ability to do basic work activities.'" *Covington v. Colvin*, 678 F. App'x 660, 664 (10th Cir. 2017) (quoting *Williams*, 844 F.2d at 751). But "the claimant must show more than the mere presence of a condition or ailment." *Hinkle v. Apfel*, 132 F.3d 1349, 1352 (10th Cir. 1997). Indeed, an ALJ may conclude that an ailment is not a medically determinable impairment—a particularly important finding, as the ALJ must consider only <u>medically determinable impairments</u> (severe or not) at subsequent steps. *See Cook v. Colvin*, No. CV 15-1164-JWL, 2016 WL 1312520, at *4 (D. Kan. Apr. 4, 2016) ("Limitations attributed to impairments which are medically determinable but are not severe must be considered at later steps in the evaluation, whereas alleged limitations attributable to impairments which are not medically determinable must not be considered at later steps.").

Ms. Reeves argues that the ALJ erred at step two because the ALJ failed to identify or consider Ms. Reeves's "vestibular disturbance," i.e., dizziness, as a severe impairment. *See* [#17 at 6-7; #19 at 1-2]. Ms. Reeves continues that the ALJ's error in this regard negatively impacted the ALJ's analysis at later steps and constitutes reversible error. *See* [#17 at 6-7; #19 at 1-2]. While Plaintiff may be correct that her dizziness has more than a minimal effect on her ability to perform work activities, I agree with the Commissioner that any error by the ALJ in finding otherwise was harmless.

In *Allman v. Colvin*, the United States Court of Appeals for the Tenth Circuit ("Tenth Circuit") explained that at step two "a claimant need only establish, and an ALJ need only find, one severe impairment[,]" as a finding of one severe impairment requires the ALJ to proceed to the next step considering *all* of the claimant's ailments (severe or not) anew. 813 F.3d 1326, 1330 (10th Cir. 2016). "Thus, the failure to find a particular impairment severe at step two is not

reversible error when the ALJ finds at least one other impairment is severe." *Id.*; *see also Smith v. Colvin*, 821 F.3d 1264, 1266-67 (10th Cir. 2016) (holding as harmless error the ALJ's failure to find a severe left shoulder impairment at step two when the ALJ considered shoulder impairments in assessing the plaintiff's RFC); *Howard v. Berryhill*, No. 17-CV-00276-RBJ, 2017 WL 5507961, at *4 (D. Colo. Nov. 17, 2017) ("While it certainly would have been prudent for the ALJ to consider Ms. Howard's chronic pain syndrome diagnosis at step two . . . the ALJ's failure to do so is not reversible error under *Allman* because she determined that two of Ms. Howard's other impairments were severe.").

Here, the ALJ found four severe impairments, *see* [#13-2 at 16], and "proceeded with the analysis as required." *Troe v. Berryhill*, No. 16-CV-02794-MEH, 2017 WL 2333101, at *7 (D. Colo. May 30, 2017) (relying on *Allman*, 813 F.3d at 1330). Thus, the ALJ did not err at step two.

## III. Step Three

Step three of the evaluation process requires the ALJ to consider whether a claimant has an impairment that meets or medically equals any listing found at Title 20, Chapter III, Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526). The severity of the impairments found in these listings precludes any substantial gainful activity. *See Bowen v. Yuckert*, 482 U.S. 137, 141 (1987); *see also Williams*, 844 F.2d at 751. Each listing specifies "the objective medical and other findings needed to satisfy the criteria of that listing[,]" and a claimant meets a listed impairment if her ailments satisfy all of the listing's criteria, 20 C.F.R. §§ 404.1525 (c)(3), 416.925(c)(3), or if her ailments medically equal a listing, *id.* at §§ 404.1526(a) (medical equivalence means "at least equal in severity and duration to the criteria of any listed impairment"), 416.926(a). The claimant's meeting or medically equaling a listing requires a conclusion of

disabled and entitles the claimant to benefits. *See Davidson v. Sec'y of Health & Human Servs.*, 912 F.2d 1246, 1252 (10th Cir. 1990).

Ms. Reeves contends that the ALJ failed to consider Ms. Reeves's dizziness under the appropriate listing. *See* [#17 at 7; #19 at 1]. Though Ms. Reeves fails to identify the appropriate listing, the Commissioner identifies Listing 2.07, disturbances of labyrinthine-vestibular function, as the only listing applicable to Ms. Reeves's dizziness. *See* [#18 at 9 & n.6]. The Commissioner argues that Ms. Reeves fails to demonstrate that she meets Listing 2.07's requirements. *See* [*id.* at 9-10]. I respectfully agree with the Commissioner.

To start, step three requires the ALJ to consider only whether any of Ms. Reeves's severe impairments, either singly or in combination, is equivalent to any listing. *See Fischer-Ross v. Barnhart*, 431 F.3d 729, 730 (10th Cir. 2005). Because the ALJ did not find Ms. Reeves's dizziness to be a severe impairment, there was no requirement that the ALJ then consider dizziness at step three. *See id.*

In addition, Ms. Reeves fails to establish that she meets or medically equals the requirements of Listing 2.07. Listing 2.07 defines disturbance of labyrinthine-vestibular function as characterized by a history of frequent attacks of balance disturbance, tinnitus, and progressive loss of hearing, as well as both:

- A. Disturbed function of vestibular labyrinth demonstrated by caloric or other vestibular tests; and
- B. Hearing loss established by audiometry.

20 C.F.R. § Pt. 404, Subpt. P, App. 1, Listing 2.07. The medical evidence discussed above demonstrates a "history of frequent attacks of balance disturbance," but fails to yield any evidence of tinnitus and progressive hearing loss or the requisite caloric or vestibular tests and audiometry

14

hearing loss. *See Lately v. Colvin*, 560 F. App'x 751, 753-54 (10th Cir. 2014) (holding that the ALJ did not err at step three because although the medical evidence established a vestibular disturbance under Listing 2.07, the medical evidence failed to establish the severity of the plaintiff's vertigo and there were no reports of tinnitus or hearing loss).

Moreover, Listing 2.00(C)(3) establishes how the Commissioner evaluates vertigo associated with disturbances of the labyrinthine-vestibular function:

> The diagnosis of a vestibular disorder requires a comprehensive neuro-otolaryngologic examination with a detailed description of the vertiginous episodes, including notation of frequency, severity, and duration of the attacks. Pure tone and speech audiometry with the appropriate special examinations, such as Bekesy audiometry, are necessary. Vestibular functions is assessed by positional and caloric testing, preferably by electronystagmography. When polytomograms, contrast radiography, or other special tests have been performed, copies of the reports of these tests should be obtained in addition to appropriate medically acceptable imaging reports of the skull and temporal bone. Medically acceptable imaging includes, but is not limited to, x-ray imaging, computerized axial tomography (CAT scan) or magnetic resonance imaging (MRI), with or without contrast material, myelography, and radionuclear bone scans. "Appropriate" means that the technique used is the proper one to support the evaluation and diagnosis of the impairment.

20 C.F.R. § Pt. 404, Subpt. P, App. 1, Listing 2.00(C)(3). Ms. Reeves's medical record is devoid of the requisite objective diagnostic tests and findings, and "her own description of her symptoms . . . is insufficient to show that she satisfied the listing." *Lately*, 560 F. App'x at 753-54 (citing 20 C.F.R. §§ 404.1529(d)(3); 416.929(d)(3) (stating that claimant's allegations of symptoms will not be substituted "for a missing or deficient sign or laboratory finding to raise the severity of impairment(s) to that of a listed impairment")). Thus, the ALJ did not err at step three.

IV.  **The RFC**

In assessing a claimant's RFC, the ALJ must consider the combined effect of all medically determinable impairments, including the severe and non-severe. *See Wells v. Colvin*, 727 F.3d 1061, 1065 (10th Cir. 2013); 20 C.F.R. § 404.1529(a); SSR 96-9p. A claimant's RFC is the most

work the claimant can perform, not the least. 20 C.F.R. § 404.1545; SSR 83-10. The ALJ's RFC assessment must be consistent with the whole record and supported by substantial evidence. *See Howard v. Barnhart*, 379 F.3d 945, 947 (10th Cir. 2004); SSR 96-8p. If it is, the court will not reverse the ALJ's decision even if it could have reached a different conclusion. *Ellison*, 929 F.2d at 536; *see also Flaherty*, 515 F.3d at 1070 (explaining that the reviewing court may not "reweigh or retry the case.").

The ALJ determined that Plaintiff retained the RFC to "perform light work as defined in 20 C.F.R. 404.1567(b) and 416.967(b) except she can tolerate no exposure to hazards such as unprotected heights and moving mechanical parts; also no concentrated exposure to extreme heat, extreme cold, and humidity. No far acuity." [#13-2 at 19]. In crafting Ms. Reeves's RFC, the ALJ first acknowledged Ms. Reeves's testimony that she was unable to work due in part to chronic dizziness, which doctors attributed to her strokes and which has caused her to fall. *See* [#13-2 at 20]. The ALJ also noted that Ms. Reeves reported issues with walking and balance in updated disability reports. *See* [*id.*]. But the ALJ found Ms. Reeves's testimony regarding the severity of her dizziness not entirely credible, *see* [*id.* at 21], and Ms. Reeves does not challenge that conclusion here.

The ALJ continued that the medical record did not support any greater limitations than those found in the RFC. *See* [#13-2 at 21]. In so concluding, the ALJ explained, "While the claimant has complained of severe symptoms, dizziness, and overall dysfunction, there are no significant exam findings or imagining records to show severe neurological changes[,]" that "examinations reveal no significant neurological deficits, full range of motion, intact 5/5 motor strength with the exception of a one-time 3/5 strength of the right lower extremity, normal grip strength, and a normal gait," and that Plaintiff is "cognitively intact with no significant deficits."

[*Id.*]. The ALJ also noted the lack of opinion evidence from Ms. Reeves's treating, examining, or reviewing physician(s). *See* [*id.* at 22].

The ALJ then discussed the medical records from Plaintiff's treating sources, much like the court discussed above. The ALJ noted that Dr. Harrison's progress notes contained mostly subjective complaints of ailments and minimal follow-up treatment, as well as several instances where Plaintiff was not following through with taking her medications and was desperately seeking disability benefits. *See* [#13-2 at 22]. The ALJ also explained that, despite reporting to Dr. Motycka the inability to walk ten feet without getting dizzy, Dr. Motycka did not observe this as Plaintiff left the consultative examination, and Dr. Motycka's exam findings were largely normal. *See* [*id.* at 23]. The ALJ then discussed Ms. Reeves's treatment notes from Green Valley Ranch Medical Center and highlighted that Ms. Reeves's physical examinations revealed no abnormalities and were "unremarkable" despite Plaintiff's complaints of dizziness. *See* [*id.* at 24]. Lastly, the ALJ discussed Plaintiff's physical therapy records, stating, "Progress notes from late 2016 through April 2017 reveal decreased motor strength and positive signs of dizziness with certain maneuvers. However, the claimant has been found to made [sic] gradual progress, with multiple indications of improved balance and strength, decreased need for therapy breaks, and 'mild' instability." [#13-2 at 25]. Based on the medical record, as well as the limitations noted by the State Agency consultants, the ALJ concluded that the RFC accounted for all of Plaintiff's limitations. *See* [*id.*].

Ms. Reeves contends that although the ALJ mentioned dizziness in the RFC assessment, the ALJ failed to account for the additional limitations dizziness posed on Ms. Reeves's ability to work. *See* [#17 at 5, 7]. Ms. Reeves continues that the ALJ failed to discuss the objective medical evidence of Plaintiff's dizziness, such as the positive Romberg tests, and failed to articulate the

17

reasons for why dizziness did not account for additional limitations. *See* [#17 at 6-7; #19 at 2-4]. Ms. Reeves asserts that it is "unclear" how she can perform even light work, given that her dizziness renders this "an impossibility." [#19 at 3].

As explained, the ALJ must consider all medically determinable impairments, whether severe or not, when assessing a claimant's RFC. *See Ray v. Colvin*, 657 F. App'x 733, 734 (10th Cir. 2016). "'The RFC assessment must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations).'" *Hendron v. Colvin*, 767 F.3d 951, 954 (10th Cir. 2014) (quoting SSR 96–8p, 1996 WL 374184, at *7). "The RFC assessment must include a discussion of why reported symptom-related functional limitations and restrictions can or cannot reasonably be accepted as consistent with the medical and other evidence." SSR 96–8p, 1996 WL 374184, at *7. I conclude that the ALJ did so here.

The ALJ's RFC assessment adequately considers the entirety of Ms. Reeves's medical records, including her reports of chronic dizziness and adverse side effects of dizziness. *See, e.g.*, [#13-2 at 21]. Specifically, the ALJ acknowledged Ms. Reeves's complaints of "severe symptoms, dizziness, and overall dysfunction," but found "no significant exam findings or imaging records to show severe neurological changes." [*Id.* at 22]. The ALJ further noted that "[m]ultiple examinations reveal no significant neurological deficits," and that Plaintiff is "cognitively intact with no significant deficits." [*Id.*]. And the court cannot say that the ALJ impermissibly cherry-picked evidence that only supported a finding of not disabled. *See Clifton v. Chater*, 79 F.3d 1007, 1010 (10th Cir. 1996) (explaining that an ALJ must discuss evidence supporting his decision, "the uncontroverted evidence he chooses not to rely upon, as well as significantly probative evidence he rejects."); *accord Chapo v. Astrue*, 682 F.3d 1285, 1292 (10th Cir. 2012)

(stating that an ALJ "is not entitled to pick and choose through an uncontradicted medical opinion, taking only the parts that are favorable to a finding of nondisability." (internal quotation marks omitted)). Indeed, the ALJ discussed Plaintiff's physical therapy medical records which were salient evidence of Plaintiff's dizziness, and noted that Dr. Motycka did not observe that Plaintiff could only walk 10 feet without getting dizzy and having to lean against something. [*Id.* at 24]. And the court's own review of those records is consistent with the ALJ's summation of the same. That is, the records indicate both a continued issue with dizziness but also several instances of progression and improved balance and stability. *See generally* [#13-9]. And it is the ALJ's (not the court's) responsibility to resolve evidentiary inconsistencies, *see Allman*, 813 F.3d at 1333, and this court may not "displace the agency's choice between two fairly conflicting views," *Zoltanski v. FAA*, 372 F.3d 1195, 1200 (10th Cir. 2004) (brackets omitted).

Further, the burden at this step in the process remains on Ms. Reeves to "show more than the mere presence of a condition or ailment." *Hinkle*, 132 F.3d at 1352; *see also Cochran v. Colvin*, 619 F. App'x 729, 731-32 (10th Cir. 2015) (rejecting Ms. Cochran's contention that the ALJ committed harmful error by failing to consider her limited hand functionality at step four because the evidentiary record did not support her contentions). Nor is the ALJ required to identify "affirmative, medical evidence on the record as to each requirement of an exertional work level before an ALJ can determine RFC within that category," *Howard*, 379 F.3d at 949, as Ms. Reeves suggests, *see* [#19 at 3]. The ALJ adequately considered all limitations to Ms. Reeves's ability to perform light work, and the court may not reweigh the medical evidence or substitute its judgment for that of the ALJ. *See Qualls v. Apfel*, 206 F.3d 1368, 1371 (10th Cir. 2000). This is so even if the ALJ did not explicitly state which limitations were or were not attributable to Ms. Reeves's dizziness, and Ms. Reeves fails to specify what those limitations would be. *See Wilson v. Astrue*,

19

602 F.3d 1136, 1140-41 (10th Cir. 2010). Accordingly, I find no error with the ALJ's RFC determination.

## CONCLUSION

For the reasons stated herein, the court hereby **AFFIRMS** the Commissioner's final decision.

DATED: April 11, 2019

BY THE COURT:

Nina Y. Wang
United States Magistrate Judge